Filed 1/20/26  In re G.K. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re G.K., a Person Coming Under the Juvenile Court Law. | B343611 (Los Angeles County Super. Ct. No. 21CCJP01169) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.B., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica Buckelew, Deputy County Counsel, for Plaintiff and Respondent.

Appellant C.B. (mother) appeals from the juvenile court's orders made at a hearing held under Welfare and Institutions Code[1] section 366.3.[2] Mother contends the juvenile court impermissibly delegated its authority over visitation and conjoint therapy to her daughter G.K. (born March 2009) and G.K.'s therapists. Mother further contends the court erred in denying mother's request for a continuance under section 352.[3] We affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Background**

The family is comprised of G.K. and mother; the two were originally from Australia and moved to the United States in 2019.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The hearing was styled as both a "post permanent plan review" pursuant to section 366.3, as well as a "permanency planning review hearing" pursuant to section 366.26. The January 22, 2025 proceeding functioned as a section 366.26 hearing following the second termination of mother's reunification services.

[3] Section 352 allows the court to continue any hearing beyond the time limit if the hearing is otherwise meant to be held provided the continuance is not contrary to the interest of the minor.

G.K. and mother had no contact with presumed father, and he was believed to have died of COVID-19 in Cameroon in 2020.[4]

**Referral and section 300 petition**

On February 17, 2021, the Los Angeles County Department of Children and Family Services (the Department) received a referral after G.K. was hospitalized on an "involuntary hold . . . for choking mother." During the hospitalization, G.K. alleged physical and emotional abuse by mother and bore marks from self-harm.

On March 12, 2021, the Department filed a section 300 petition alleging G.K. came within the jurisdiction of the juvenile court based on subdivisions (a), (b)(1) and (c) of section 300. Specifically, it was alleged G.K. (1) suffered physical abuse when mother hit G.K.'s "thigh with a mineral crystal"; (2) was "at risk of serious physical harm, damage, danger and medical neglect" as the result of mother's "limited ability to provide care and supervision of the child due to the child's specific mental health needs"; and (3) was emotionally abused by mother and the abuse "resulted in the child experiencing depression, anxiety, paranoia, suicidal ideations, self-harming behaviors and aggressive and assaultive behaviors towards others." The petition recommended G.K. be detained pending further hearing.

**Detention hearing**

At the March 17, 2021 detention hearing, the court found a prima facie case existed and the facts demonstrated G.K. was a person described in section 300 and "[r]easonable efforts ha[d] been provided to prevent removal." The court also found there

---

[4] On June 10, 2021, the court found due diligence in the attempt to locate father. During a hearing on April 6, 2023, mother indicated father died on April 1, 2021.

3

was "substantial danger to the physical and emotional health of the child and there [we]re no reasonable means by which the child's physical or emotional health may be protected without removing the child from the home" and "that it would be detrimental to the child to be placed in the home" or in the care of mother. Therefore, the court "order[ed] the child removed from the home" and "placed in the care, custody and control of the Department." The court ordered the Department to provide the parties with reunification services and monitored visitation between mother and G.K. two times per week with discretion by the Department to liberalize.

**Adjudication and disposition hearing**

On June 10, 2021, the court sustained the petition and G.K. was "declared a dependent of the court" under section 300, subdivisions (b)(2) and (c)(1); the court dismissed the allegations pursuant to subdivisions (a)(1) and (b)(1). The court found it "reasonable and necessary to remove the child from the mother" because "it would be detrimental to [G.K.'s] safety, protection, or physical or emotional well-being." The Department was ordered to provide reunification services to G.K. and mother. Mother's case plan included, inter alia, conjoint counseling with G.K., parenting classes, individual counseling, a National Alliance on Mental Health parent support group and "psychoeducation regarding [G.K.'s] diagnoses." The court ordered two monitored visits per week with discretion to liberalize.

**Six-month review hearing**

On December 9, 2021, the court held a six-month review hearing. The court found "by clear and convincing evidence that return of [G.K. to mother] would create a substantial risk of detriment to the child" and "that continued jurisdiction is

4

necessary." The court found mother's "progress made toward alleviating or mitigating the causes necessitating placement" "ha[d] not been substantial." The court further found the Department had "complied with the case plan" by providing or offering "reasonable services to enable the child's safe return home," and ordered reunification services continued.

During the hearing, G.K.'s counsel shared "that [G.K.] would prefer to not have any visits with mother," but she was "willing to follow her therapist's recommendation to reduce the visits to once a week." Mother objected to the reduction but also agreed to submit on the Department's recommendation and "whatever is in [G.K.'s] best interest." After reviewing the status reports, the court noted "there ha[d] been triggering events when [G.K.] ha[d] been ordered to visit with the mother" and, because "it is important to . . . maintain stability of the child's mental health," the court reduced the monitored visitation to a minimum of once per week with discretion to liberalize.

**Twelve-month review hearing**

On May 10, 2022, the court held a 12-month review hearing. The court found by clear and convincing evidence return of G.K. to mother "would create a substantial risk of detriment to the child" and, therefore, found continued jurisdiction necessary. The court found mother had been cooperative and involved in G.K.'s care and was in compliance with her case plan. However, because mother had not completed any of the programming, mother's case plan progress was not substantial. The court ordered the Department to continue reunification services and continue monitored visitation.

**Eighteen-month review hearing**

On September 9, 2022, the court held an 18-month review hearing. The Department and G.K.'s counsel asked the court to terminate services. G.K.'s counsel noted the issues which brought them into the jurisdiction of the court had not been resolved, "communication between mother and [G.K.] ha[d] not improved," and G.K. felt overwhelmed "about the quantity of visits," that had "not been liberalized because [G.K.] continue[d] to experience anxiety during the visit[s]." In regard to conjoint counseling, G.K.'s counsel noted mother continued to push for conjoint counseling against the recommendation of the mental health professionals who advised against the sessions because of G.K.'s mental health and "current suicidal ideation." Mother's counsel asked the court to "extend family reunification services pursuant to section 350."

The court found mother had "work[ed] very hard to address her own issues" and had completed the bulk of her services with the exception of the conjoint counseling in large part because G.K. "[wa]s not ready" to participate. Therefore, the court found that continuing mother's services was in G.K.'s best interests, and extraordinary circumstances necessitated a continuance of the hearing for three months "to see how the conjoint counseling . . . and . . . monitored visitation goes."

The Department was ordered to provide "very detailed reports" on the status of conjoint therapy visits and set a progress hearing for October 2022.

**Progress hearing**

On October 14, 2022, the court held a "progress hearing regarding conjoint counseling visits for mother and [G.K.]." The court noted the "fragile" state of G.K.'s mental health at that time

6

and ordered the visits to continue but ordered conjoint counseling to be suspended to allow the therapist to "observe the child's behavior and make sure that her mental health [wa]s stabilized before [resuming]." The court ordered continued monitored visitation between mother and G.K. and held "after four successful monitored visits conjoint counseling may proceed."

**Mother's walk-on request for conjoint counseling**

On November 23, 2022, mother filed a walk-on request because in October the "court ordered conjoint therapy . . . to begin after completing [four] visits without incident" and despite four uneventful visits being completed on November 13, 2022, conjoint counseling had not begun. Mother was seeking a "new therapist to be appointed to commence conjoint counseling forthwith" or, in the alternative, the current therapist be questioned as to her refusal to provide conjoint counseling.

On December 1, 2022, the court held a hearing on mother's walk-on request regarding the progress toward conjoint counseling. Mother explained she would like G.K.'s former therapist, Dr. Lynn Steinberg, to take over conjoint therapy and for sessions to begin within the week. Dr. Steinberg had been G.K. and mother's therapist in 2020 before the court had jurisdiction.

Minor's counsel objected to changing therapists to Dr. Steinberg and explained the current therapist had not simply disregarded the court's previous orders regarding when conjoint counseling should begin but instead was "fulfilling their professional obligation" to ensure the stability of G.K.'s mental health before conjoint counseling could recommence. Minor's counsel noted G.K.'s current therapist would be leaving the agency soon and posited the new therapist assigned to the case

might have a different approach that could be helpful. The Department agreed with minor's counsel and reiterated that, although there had been four uneventful visits, stability of G.K.'s mental health, which was part of the court's orders, had not been reached. The Department argued it was not "appropriate to force the issue at [that] point."

The court clarified its prior order had been that "conjoint counseling . . . *may* resume after four uneventful monitored visit[s]." (Italics added.) Thus, the court's order was not mandatory; instead, it hinged on G.K.'s mental health, which was the "paramount concern." The court noted G.K. was "extremely mentally fragile" and different from other children. As a result, the court found the therapist's findings to be "very weighty." Moreover, the court found the past four visits *had not* been entirely uneventful because G.K. had become "irritated" and "annoyed" by mother. The court noted G.K. did not want to do conjoint therapy with mother but explained, "I need the therapist to provide information . . . as to why the child has such strong feelings against having therapy sessions with the mother" and ordered the Department to provide this information in their next report. Accordingly, the court ordered the Department and minor's counsel to "ensure the [c]ourt receives information regarding why [G.K.] does not want to continue conjoint counseling" and to determine whether Dr. Steinberg was a suitable option for conjoint counseling.

**Continued 18-month review hearing: termination of services**

In preparation for the December 8, 2022 hearing, G.K. was interviewed by then-therapist Maria Ponce and children's social worker Veronica Oviedo. G.K. told Ponce and Oviedo she did not

8

want therapy switched to Dr. Steinberg because Dr. Steinberg did not believe her regarding prior allegations of sexual abuse against father; G.K. also indicated that mother preferred Dr. Steinberg because she always agreed with mother "as long as she was paying her." G.K. submitted a letter to the court to explain why she did not want to participate in conjoint therapy with mother. In it, G.K. emphatically stated, "[u]ntil my mother is able to take accountability, it is way beyond me to have therapy with her. I repeat, I DO NOT want therapy sessions with her."

On December 8, 2022, the court held the previously continued 18-month review hearing. The Department and minor's counsel recommended services be terminated; they noted the issue was not with mother's compliance with the case plan, but was instead "whether the mother ha[d] sufficiently addressed the issues that led to th[e] court taking jurisdiction" in the first place and whether mother was able to "care for [G.K.'s] specific mental health needs." Mother's counsel pointed to mother's progress and asked the court to extend reunification services.

The court found mother had substantially complied with her case plan and the Department had made reasonable efforts to return G.K. to a safe home; however, mother's "efforts [we]re not sufficient to meet the level of the child's mental health needs." Specifically, the "first conjoint counseling that occurred . . . did not go well" and "actually triggered self-harm for [G.K.]." The court pointed to the letter written by G.K. wherein she "very articulately and eloquently wrote . . . that [mother] ha[d] not taken any responsibility and accountability for her actions" and "implore[d]" the court not to allow conjoint counseling with mother to continue. This, the court found, was "more than

9

enough for [it] to make a decision conjoint counseling [wa]s not in the best interest of the child." The court noted "mother continue[d] to blame everything around her . . . besides . . . herself." Ultimately, the court terminated reunification services and set the matter for a permanency hearing for June 12, 2023. Visitation was ordered to continue.

**Permanency planning hearings**

On April 6, 2023, the court held a permanency planning review hearing. The court continued the hearing due to untimely notice to mother. Relevant here, G.K. indicated she "would like to have weekly visits" with mother and the court ordered the Department to "[f]acilitate weekly monitored visits between mother and [G.K.]."

On June 12, 2023, the court held the permanency planning review hearing. The court noted the parties agreed legal guardianship was the permanent plan.

On July 13, 2023, the court held a permanency planning hearing. G.K. was hospitalized; as a result, the hearing was continued.

On July 26, 2023, the court was made aware of a "fallout" in the relationship between G.K. and her foster parent and, as a result, G.K. was placed at Five Acres, a short term residential therapeutic program (STRTP) on July 18, 2023. On September 1, 2023, the court held a STRTP review hearing and found G.K.'s needs could not be met in a "family-based setting" and placement in the STRTP would provide "the most effective and appropriate care" for her. The court noted G.K. reported her goal was "to return to [mother] eventually under certain conditions."

On October 12, 2023, the court held the permanency planning hearing. Minor's counsel requested unmonitored visits

10

with mother right away with the goal of moving toward overnight visits. Mother agreed and asked for conjoint counseling despite reunification services having been terminated. The Department sought a "step-up plan" to ensure this attempt at reunification went "smoothly." The court ordered unmonitored day visits between mother and G.K. and ordered the Department to "establish a step-up plan to help [m]other transition to overnights."

**Mother's section 388 petition**

On December 8, 2023, mother filed a section 388 petition requesting the court take the permanency planning hearing off calendar, reinstate reunification services, and order overnight visits and conjoint counseling. On December 11, 2023, the court ordered the Department to file a response to mother's section 388 petition, assess overnight and extended visits between mother and G.K. and refer the pair to conjoint counseling.

On January 26, 2024, after a hearing on the request, the court granted mother's section 388 petition. The court reinstated reunification services, granted mother's request for overnight visits, and ordered the pair to begin conjoint counseling "without the requirement of the clinician or mental health team authorization." The court found G.K.'s current placement continued to be necessary and appropriate, but allowed the Department discretion to begin extended visits with mother and noted the Department "may walk the matter on for home of parent . . . if deemed appropriate."

**Progress after reunification services were restarted**

On February 29, 2024, the court received a report that revealed G.K. and mother had an argument during a recent visit and, as a result, G.K. engaged in self-harm and called her STRTP

placement.  During the call, mother could be heard in the background yelling at G.K., "you are [a] ward of the state, and that someone needs to come pick you up."  Mother was angry and "struggling to deal with [G.K.'s] self-harm."

On March 1, 2024, the court held a progress hearing.  G.K. read a statement to the court and requested a "cooling-off period" between herself and mother.  Mother accepted the cooling-off period.  The court ordered visits and contact between mother and G.K. to be suspended until further notice.

On March 7, 2024, the court received a letter from G.K. wherein she explained her feelings toward mother and that she no longer wanted to have contact, visits, or conjoint therapy with her.  On May 1, 2024, the court received a report from the Department.  In pertinent part, the report noted G.K. had been "placed on three separate psychiatric hospitalizations" on March 20, April 3, and April 11, 2024.  She was last discharged on April 19, 2024.  Mother indicated she would like visits and "stressed the importance of conjoint therapy to be able to work on her relationship with [G.K.]."  G.K. noted she "has never felt supported by mother and d[id] not want to reunify with [her]."

On May 10, 2024, the court held a progress hearing. Minor's counsel indicated G.K. was "open to visits with her mother."  The court ordered the Department to "[f]acilitate . . . visitation in a therapeutic setting or other appropriate setting."

On May 27, 2024, G.K. and mother "resumed in-person visitation[]" and the Department continued to facilitate the visits. The visits were two hours every Saturday morning.

A status review report was filed by the Department on July 12, 2024.  At that time, G.K. was refusing to allow mother to participate in child and family team "meetings or to participate in

12

family therapy." She reported "feeling triggered" when the Department or her team inquired about conjoint therapy. While mother was being "very attentive and cooperative," G.K. "fluctuate[d] on wanting to reunify with mother and w[ould] not participate in conjoint therapy." The report indicated G.K. was attending visitation with mother.

On July 26, 2024, the court held a permanency planning review hearing. The Department noted continued reunification services would be helpful, but recommended mother's services be terminated "only because of the time." G.K. expressed continued interest in reunifying with mother. Mother asked for the court to extend services and emphasized her belief that conjoint counseling was "critically important to ensure a successful transition."

The court found G.K.'s current placement was necessary and appropriate, and the Department had "complied with the case plan." The court ordered conjoint counseling to begin immediately and unmonitored visitation to begin that weekend. After two successful unmonitored visits, the court indicated mother and G.K. could begin overnight visits "if they wish[ed]."

On August 6, 2024, the Department filed a report with the court which indicated G.K. no longer wanted to reunify with mother and wanted visits to stop. The report noted there had been successful unmonitored visits on July 28 and August 1, 2024. On August 3, 2024, however, an unmonitored visit occurred and "went downhill" after mother asked G.K. about school. G.K. "appeared to be upset [and] walked away from mother." After finding G.K. in the restroom, mother called the Department and asked that G.K. be picked up from the visit location, which upset G.K. Mother agreed she could have

13

handled the situation better, but she became "scared when [G.K.] ran off." After the visit, G.K. reported wanting no further visits with mother. In the end, G.K. felt "she ha[d] given mother many chances and she [kept] abusing those chances" and G.K. believed, despite meaning well, mother would never change.

On August 9, 2024, a progress hearing was held. G.K. expressed she did not want contact with mother and was seeking a "time-out period." Mother did not object and only asked "the Department [to] have counseling at the ready." The court ordered further visitation and conjoint counseling suspended until mother and G.K. were both ready.

A report filed by the Department on August 30, 2024, indicated G.K. was not speaking to mother and still did not want mother involved in her therapy.

On October 17, 2024, the Department filed a report in preparation for a hearing the next day. The report indicated mother was insisting family therapy be scheduled; however, the therapist noted G.K. was not ready and had "declined to participate." The therapist offered to schedule virtual sessions and invite G.K. to participate, but "[m]other declined and requested a schedule be created for in-person sessions." The therapist remained "available to continue the in-person sessions with [mother] and [would] include [G.K.] once she [wa]s ready to participate in family sessions." On October 18, 2024, the court held a progress hearing at which the court ordered visitation and conjoint therapy to begin when G.K. "[wa]s ready for it," and, in the meantime, mother and G.K. could write to one another as they wished. Mother's counsel expressed concern "that mother's due process rights [were] being implicated" because G.K. was

14

"refus[ing] to engage in visitation" and reiterated mother's belief that conjoint therapy was "critical to reunification."

On October 29, 2024, G.K. was placed in a psychiatric hospital after she took scissors from her teacher's desk and engaged in self-harm. While hospitalized, G.K. requested to see mother. She was discharged on November 6, 2024, and a visit was arranged for November 9, 2024. The visit went well; however, when asked on November 12, 2024, if she would like another visit with mother, G.K. declined. As a result, the Department reported it would "facilitate visit[s] when [G.K.] informs . . . she is ready to resume visits."

On November 20, 2024, the court held a hearing. Mother requested "scheduled weekly calls" between herself and G.K. The court was pleased to see improvement in mother's communication but declined to order a "fixed schedule" for calls or visits. The court did not want to "forc[e]" G.K. because, after getting to know G.K. "all these years," the court believed it would "only drive her away." As a result, the court ordered no change to visitation and instead found a "fluid visitation" schedule would be more beneficial and would yield better results.

**Second termination of services**

On December 30, 2024, the Department filed a status review report to update the court on G.K.'s progress and reunification efforts. G.K.'s current placement was in a "small family home." G.K. had been hospitalized on November 21, 2024, after she "used a piece of . . . glass to self-harm," and was discharged on December 5, 2024. G.K. was still "not ready to participate [in] . . . family therapy"; as a result, mother was attending weekly on her own. On December 6, 2024, mother again requested the Department speak to and consider

15

Dr. Steinberg as G.K.'s therapist; however, the Department noted given the number of years (five) since Steinberg last worked with G.K., it "was concerned about the relevance of her opinion to [G.K.'s] current course of treatment." The Department also noted G.K.'s documented negative feelings toward Dr. Steinberg.

The Department reiterated "[m]other received approximately 21 months of reunification services" prior to termination of services and another 12 months of services after the court reinstated services; in between, G.K. "received approximately 13 months of permanent placement services." Mother had been involved in G.K.'s "life as much as possibly permitted by [G.K.]" and had "completed the services and programs from the initial case plan." Despite these efforts by the Department and mother, G.K. was "able to advocate for her own needs" and "[u]nfortunately, [G.K.] d[id] not want to participate in conjoint counseling with her mother." Ultimately, the Department recommended the court terminate services as they had been exhausted.

During a "team" meeting on January 16, 2025, G.K. indicated she did not want to reunify with mother and instead wanted "to age out of foster care." G.K. read a poem which closed with, "Mum, I do not want to reunify. I can write 10 more pages as to why, yet time is so sparse in our lives."

On January 22, 2025, a permanency plan review hearing took place.[5] Minor's counsel argued it was too risky for G.K. to be returned to mother, noted the case had been open for four years and asked that reunification services be terminated. Mother's

---

[5] This hearing was also referred to as a post permanent plan review hearing, which took place pursuant to section 366.3.

16

counsel objected to the termination of services, asked the court to extend services for six months pursuant to section 352, and asserted mother's due process rights were violated by G.K.'s "veto power to visits and conjoint counseling." The Department argued the court did not delegate its authority to G.K. or therapists to decide if visitation or counseling would take place. Instead, the court "set clear guidelines as to . . . what needed to occur and really tried to assist the family with setting up the visitation . . . and for several reasons they did not occur. . . . [I]t wasn't because the court delegated that responsibility to another person[, but] that this case has been a real challenge."

The court denied mother's request to continue the permanency planning hearing and terminated mother's reunification services. The court noted, at the time it granted mother's section 388 request, mother had six months to reunite; in this case, however, at the six-month mark everyone agreed that another six months would be beneficial. As a result, services were continued for an additional six months. The court noted mother's "unwavering commitment to be in [G.K.'s] life." However, the court emphasized it must also "consider what is in [G.K.'s] best interest." In that regard, the court found it "really clear" that G.K.'s "vacillation" with regard to reunifying with mother "was just to provide the mother with an opportunity to prove herself," and one year later "there ha[d] been no improvement. [G.K.] continue[d] to self-harm" and G.K.'s safety is the court's "paramount concern."

The court found mother's due process rights had not been violated because the Department went "above and beyond to help mother and [G.K.] reunify" and worked to "ensure that they ha[d] visits and conjoint counseling." The court noted the pair had

17

"five or six conjoint counseling" sessions that "did not go well because the sessions triggered [G.K.] because of the mother's lack of empathy, lack of accountability, and lack of effective communication." The court further noted G.K. was making "a lot of progress in school" and during that time she was not having visits with mother, and G.K.'s therapists were recommending "that conjoint counseling should not start because [G.K.] [wa]s not ready." Additionally, G.K. had episodes of self-harm apparently triggered by the post-traumatic stress of "her experience [of] living with her mother and the abuse that she suffered." The court reiterated G.K. was not granted "unfettered decision making" in terms of visiting mother, but instead the court needed "to make sure that her mental health [wa]s stable before [having] any visits with [mother]."

The court found G.K. was "in a safe place" with her current caregiver and would "remain[] a dependent of the [c]ourt" and that "placement in foster care with a permanent plan of another planned permanent living arrangement . . . [wa]s ordered as the permanent plan" for G.K. The court found because G.K. was turning 16 in less than two months, "there [wa]s no compelling reason to conduct a [p]ermanency [p]lanning [h]earing pursuant to [section] 366.26."

Mother timely appealed.

## DISCUSSION

**I.    The juvenile court did not abdicate its authority or violate mother's due process rights when making**

18

**and enforcing conjoint counseling and visitation orders**

Mother contends the court violated her constitutional due process rights by "delegating its authority over conjoint therapy and visitation" to G.K. and/or G.K.'s therapists.[6]

### A.     *Conjoint counseling*

Mother argues "the court failed to assert its authority to make sure that conjoint therapy actually occurred"  and, because conjoint therapy was the pair's best shot at reunification, without it, "G.K.'s attitude toward [m]other would continue to oscillate." Mother's argument suggests the court and the parties did not understand the important role conjoint counseling would serve. Her argument also suggests, however, the court had the burden of forcing G.K. to participate in conjoint therapy.  It did not.

In juvenile dependency cases, the court has the authority to issue "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of [a dependent] child" and to "direct any reasonable orders to the parents or guardians of [that] child."  (§ 362, subds. (a) & (d).)  ""The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion."""  (*In re F.P.* (2021) 61 Cal.App.5th 966, 975.)

"Unlike visitation, there is no statutory right to counseling. Counseling is merely a service the court may order if the court thinks it would benefit the parent and the child.  [Citation.]  A

---

[6]     We note, throughout mother's opening brief, she interchanges her contentions regarding visitation and conjoint counseling.  Because they are two separate orders and the rights to each are different, we have separated them.

court may properly decline to order conjoint counseling if the child's therapist believes the child is not ready for it." (*In re F.P., supra*, 61 Cal.App.5th at p. 975.)

Here, the juvenile court did not leave it up to the therapists or G.K. to decide whether conjoint therapy would take place, only when the sessions should begin, consistent with the therapeutic goals of counseling and G.K.'s well-being. (Cf. *In re C.S.* (2022) 80 Cal.App.5th 631, 640–641 ["the visitation order granting [mother] visitation rights and expressly stating the frequency and duration of visits, while [also] requiring [the child's] therapist to approve the start of those visits, did not constitute an unlawful delegation of judicial authority"]; *In re S.H.* (2003) 111 Cal.App.4th 310, 319 ["the [child protective agency] and mental health professionals working with it and with the dependent child may determine when visitation should first occur"].) This was not an improper delegation of authority.

Relying on *In re S.H.,* mother argues the court allowed "G.K. veto power over visits and family therapy" despite her lack of mental stability or demonstrated maturity to make "adult decisions" about "what was in her best interests." *In re S.H.* does not offer mother support. There is no question mother consistently argued conjoint counseling was an integral component to reunification. To this end, conjoint counseling orders were in place to varying degrees throughout the case.

By our count, throughout the course of this case, G.K. was hospitalized for self-harm nearly 20 times, oftentimes with occurrences increasing when she was pushed to visit or attend counseling sessions with mother. For example, in January 2024, upon reinstatement of services, the court ordered conjoint counseling to begin regardless of the therapist's

20

recommendations; however, during an overnight visit in February 2024, G.K. self-harmed, which resulted in G.K. seeking no contact with mother. (See *In re S.H.*, *supra*, 111 Cal.App.4th at p. 317 ["the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation"].)

Due to the fragility of G.K.'s mental health, the court's orders for conjoint therapy were often conditioned on the recommendations of G.K.'s therapists or G.K.'s readiness. These orders did not improperly delegate decision making to the therapists or "allow G.K. to run the show." Instead, the court was in a position where it needed to balance the potential benefits of forcing conjoint counseling with the importance of G.K.'s mental health and well-being. We find substantial evidence supports the trial court's findings and it did not abuse its discretion in conditioning counseling on G.K.'s readiness and/or therapist's recommendations. (See *In re F.P., supra*, 61 Cal.App.5th at p. 975 [juvenile court did not abuse its discretion in ordering conjoint counseling when deemed appropriate by the child's therapist because the child "repeatedly stated he was afraid of [the] mother and said he wanted no contact with her," became "stressed and anxious when [the] mother made harassing phone calls to his caregiver," and "engaged in self-harming behaviors and was twice hospitalized for suicidal ideation"]; *In re Andrea G.* (1990) 221 Cal.App.3d 547, 556 [where a 12-year-old child "insisted . . . she did not want conjoint therapy with her mother" because the mother did not "understand the consequences of her own actions," the court did not abuse its discretion in not ordering it].)

21

**B.** *Visitation*

"[M]other essentially argue[s] her [due process] rights had been violated because the minor continuously refused visits and the court failed to do anything about it." Because she asserts her constitutional rights have been violated, mother urges us to use a de novo standard of review. (See *In re J.H.* (2007) 158 Cal.App.4th 174, 183 [issues involving constitutional questions are subject to de novo review].) However, an appellate court reviews orders setting the terms of visitation for an abuse of discretion (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356) and we review the juvenile court's finding that visitation would be detrimental under the substantial evidence standard (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581, disapproved on another ground by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7). Under either standard, the court did not err.

Section 362.1, subdivision (a)(1)(A), provides: "In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . , any order placing a child in foster care, and ordering reunification services, shall provide . . . [¶] . . . for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044 (*Sofia M.*).) Importantly, section 362.1, subdivision (a)(1)(B), also states: "No visitation order shall jeopardize the safety of the child." (See *In re S.H., supra*, 111 Cal.App.4th at p. 317, fn. 9 ["The court may deny a parent visitation only if visitation would be harmful to the child."].)

Preliminarily, we note mother did not object to the court's suspension of visitation orders and, instead, continued to push for conjoint counseling. A "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on unrelated grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) In any event, we find substantial evidence supports the court's finding that forcing visits would be detrimental to G.K.'s well-being and, therefore, the court did not abuse its discretion in making and enforcing its visitation orders.

Despite mother's contention that the case is not relevant here, we find *Sofia M., supra*, 24 Cal.App.5th 1038, instructive. There, a 12-month review hearing occurred three months after the dependent teenager had begun refusing to visit with her mother, and the mother's counsel asked the court for "'the visits outlined in'" a previous order. (*Id.* at p. 1043.) The court granted the request but visits still did not occur. (*Ibid.*) On appeal, the mother contended the court erred by failing to "enforce its visitation order." (*Id.* at p. 1044.) The appellate court rejected the contention, holding the juvenile court had properly ordered visitation; if the mother had wanted a different order that would encourage the child to agree to visitation, it was "the parent's burden to request a specific type of enforcement, or a specific change to the visitation order." (*Id.* at p. 1046.) "Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent. Trial judges are not mental health experts, nor child behavior experts." (*Ibid.*) In other words, "[t]he court does

23

not err by failing to do that which it is not requested to do." (*Ibid.*)

Mother argues *Sofia M.*, is inapt because there were significant periods from March to May 2024, and August 2024, through termination of services in January 2025, when there were no visitation orders of which to seek enforcement. It is true there were no *mandatory* visitation orders in place between March and May 2024, and after August 2024. Beginning in October 2024, however, the court ordered G.K. "may start visitation, conjoint therapy, or any other form of contact with the mother when [G.K.] [wa]s ready for it." In November 2024, mother asked the court for specific visitation orders—to order scheduled phone calls between the pair—but the court declined to "order . . . a fixed schedule," and instead found it would suffice that G.K. knows how to reach her mother and will reach out if she would like to; the court found "forcing [G.K.] to have a relationship o[r] forcing her to have a visitation schedule [would not] actually improve the mother and daughter relationship."

It is clear as G.K. got older—approaching 16 years old—and the court became more familiar with G.K. and her mental health and crisis patterns, the court found it was not appropriate to force visits with mother and instead found a "fluid visitation" schedule would be more beneficial and would yield better results. The court noted each time G.K. was forced to visit or the topic of conjoint counseling was pushed, it "just dr[o]ve her away." Instead, when the "fluid visitation" schedule was in place, "good results" were yielded.

Substantial evidence supports the court's findings that G.K.'s mental health was fragile and needed to be top of mind when determining appropriate visitation orders. There is no

24

evidence G.K. was allowed to "r[u]n the show" or that the court's orders unconstitutionally delegated its authority to G.K. Therefore, *In re S.H.*, on which mother relies, is inapposite.

## II.    The juvenile court did not abuse its discretion in denying mother's request to continue services pursuant to section 352

Mother contends, though this case had gone "on for far longer than the normal maximum, there was nothing to be gained in terminating efforts to reunify [G.K.] with [m]other." Therefore, "this case presents extraordinary circumstances where, regardless of the statutory timelines, continuation of reunification efforts was in the minor's best interests—precisely the type of scenario that section 352 was designed to facilitate." Respondent argues, "Nothing in the record indicates mother was moving toward changing her behaviors . . . or altering her approach to [G.K.] as she continued to deny her fault or shortcomings regarding [G.K.]."

"By its terms, the statutory discretion to continue 'any hearing' under section 352 extends to the section 366.26 permanency planning hearing." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 632.)  "In the past, California courts have found good cause in a number of cases where "'extraordinary circumstances'" justified an extension and doing so was consistent with the child's best interests." (*Ibid.*)  "'Extraordinary circumstances exist when "inadequate services" are offered by the child welfare agency or "an external force over which [the parent has] no control" prevented the parent from completing a case plan.'" (*Ibid.*)  "In determining whether to grant relief, the juvenile court must consider whether there are exceptional circumstances constituting good cause for the continuance and

25

whether the continuance would be contrary to the child's interests." (*Id.* at p. 635.)

Here, there were no "exceptional circumstances constituting good cause for [a] continuance." (*Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 635.) In denying mother's motion to continue, the court noted it granted mother's section 388 request to reinstate services in January 2024, and after six months, the court extended services for an additional six months. The court found "no reason for [it] to grant additional time for the mother to continue with her reunification . . . and [further efforts to do so are not] in [G.K.'s] best interest." Mother and G.K. were provided nearly two years of reunification services, from March 2021 through December 2022, and another year of services, from January 2024 through January 2025. The court found the Department provided reasonable services to mother and further found mother was compliant with her case plan. Despite the efforts of all the parties involved, however, reunification remained a challenge given the instability of G.K.'s mental health and safety. The court did not abuse its discretion in finding it was in G.K.'s best interest to terminate services and move toward permanency.

## DISPOSITION

The dispositional orders concerning conjoint counseling and visitation are affirmed. The court's order terminating mother's

26

reunification services and denying mother's motion under section 352 are affirmed.

CHAVEZ, J.

We concur:

LUI, P. J.                         RICHARDSON, J.